.(20 Misc. Rep. 442.)

## DEXTER SULPHITE PULP & PAPER CO. v. FRONTENAC PAPER CO. et al.

(Supreme Court, Special Term, Jefferson County. May, 1897.)

1. WATER RIGHTS—CONVEYANCE.

Certain land and a water power appertaining thereto, granted to one S. by a chain of conveyances, became vested in N. He, by deed, conveyed to one M. the same land that was conveyed to S. by metes and bounds. The deed made no specific reference to the water power, but contained the ordinary clause conveying all and singular the tenements, hereditaments, and appurtenances thereunto belonging. The real estate to which this power conveyed to S. related did not border on the river or dam, the water being conducted to the mill by artificial channels. Down to and at the time of the conveyance to N. the mill to which this water power related was used solely as such, and the channels by which the water was conducted to the mill at the time of such conveyance were open and visible. *Held*, that the use of the water power was incidental to the enjoyment of the property conveyed, and that it passed as an appurtenance without words of a specific conveyance, though the land was described by metes and bounds, and the water power was not taken from land owned by the grantor.

2. SAME—PRIORITY.

An owner of certain land was the owner of one-half of a certain grant of water described as a right to use nine cubic feet of water, or so much as would pass through a certain aperture under all the head that could be obtained. It 1872 he conveyed to one L. the premises and the water power above described. Certain other land and superior water rights were conveyed prior to 1886 to L. and others, and they, in 1886, conveyed said latter premises and water rights to plaintiff's predecessor. The deed, after describing the property and water rights to be conveyed, provided that they should be subject to the rights of L. at all times to draw 4½ feet of water to the shop situated on the premises conveyed to him by the deed originally described. *Held*, that such deed did not make the right obtained by. L. under the first deed prior in right to that obtained by plaintiff under his deed from L. and others.

3. SAME—EXTENT OF RIGHT.

A deed in 1841 conveyed the right to use so much water as should be sufficient for the uses and purposes of a woolen mill on certain premises. The evidence of many witnesses speaking of various times, and covering a period reaching back to a very early period of the mill, was that at times it required for full and complete use that the water in the pond should be accumulated to the crest of the dams, and that other owners of powers respectively recognized and acquiesced in such use and enjoyment. *Held*, that the successors to the original grantee were entitled, as against subordinate power owners, to have water accumulated to the depth of the dam.

Action by Dexter Sulphite Pulp & Paper Company against the Frontenac Paper Company and others to determine the rights of plaintiff as grantee of certain water powers, and prays for an injunction against defendant using greater power as against plaintiff than they were entitled to. Decree for plaintiff.

Rogers & Atwell and John Lansing, for plaintiff.

Smith & Smith, for defendant Leonard & Gilmore Co.

Porter, Walts & Porter, for defendants Charles E. Jones and Catharine Hunter.

Purcell & Carlisle, for defendants Frontenac Paper Co., St. Lawrence Paper Co., and Charles R. Parmalee, as temporary receiver thereof, and Henry Binninger.

G. S. & H. L. Hooker, for defendants William Young and Mary Nutting.

Anson Harder, for defendants Osborne & Cook.

H. W. Steel, for defendant James Frost.

HISCOCK, J.   Black river, at the village of Dexter, Jefferson county, is a rapid, nonnavigable private stream, consisting of two branches, and at and prior to the times hereinafter mentioned sep-arate dams had been constructed across both of said branches, and known and hereafter referred to as the north and south dams and branches, respectively, which have ever since been, and still are, maintained, thereby forming a pond, and creating a water power with 12 feet or more of head.   Prior to January 1, 1841, one Dex-ter and others had become the owners of a large quantity of land abutting upon each side of said river at said locality, and also of all the water power and water rights in said river at said point, subject to the right of the Black River Lock & Navigation Com-pany, which has entirely disappeared, and also to the right of one Solon Stone to take a certain amount of water from said stream which, upon the other hand, still does appear herein.   Said owners, sometimes known as the Dexter Village Company, with the exception of the one live, superior water right above mentioned, are the conceded common source of title of all the rights claimed by the various parties respectively in this case.   There is no serious dispute over the fact that by these original owners legal and effective conveyances were made of certain rights; or over the priority and relation to each other of those grants as originally made; or, with two exceptions, hereafter treated, about the manner in which those rights so originally grant-ed have by legal chains of title descended to and become vested in undisputed present owners, respectively, who are parties here.   These various rights, and the parties now possessed of them, are as fol-lows:   The right known as the "Solon Stone" one, and above re-ferred to as concededly superior to all others, was "the privilege of taking water from the north or little dam   *   * · *   sufficient to carry four carding machines and one fulling stocks."   This is one of the powers about the present lodgment or existence of which a dispute arises, it being claimed by the defendant Nutting upon one hand, and upon the other it is insisted by various of the parties that it has expired.   It will be considered later on.   The next right con-cededly superior to the extent of its original terms of grant to all others is the one claimed by plaintiff.   January 1, 1841, through the owners above mentioned, there was conveyed to the Jefferson Woolen Company certain of the lands so owned by them as afore-said upon the Black river, and concededly covering the same prem-ises now occupied by the plaintiff, and thereafter, and on or about October 1, 1841, the same grantors, by perpetual lease, conveyed to said Jefferson Woolen Company "so much water to be taken from the Black river   *   *   *   through the canal or race   *   *   *   as shall be sufficient for the uses and purposes of the woolen manufactory situated upon said premises [referring to the land described in the deed above mentioned], provided that the river,   *   *   *   under

the hereinafter mentioned restrictions, shall yield so much water," subject to the right secured by law to the Black River Lock & Navigation Company, and the right of Solon Stone for a clothier shop, "and to have precedence over all other grants of water on said dams." A distinct and separate chain of title for and of the rights under the above-mentioned lease, as distinguished from the deed of land, is not preserved. Said lease is not mentioned in subsequent grants, but one chain of deeds or conveyances is employed to cover the rights both of real estate and water. No serious question, however, was raised upon the trial, or, in my opinion, could be, but what the terms of the conveyances used were sufficient to include the water power. The property and water rights conveyed as aforesaid to the Jefferson Woolen Company have passed by a chain of grants and conveyances to the plaintiff, subject to the possible modification based upon two contentions made here. One of those arises between plaintiff and defendant Nutting as to the present existence of the rights granted to Solon Stone already mentioned, and the other arises upon the claim by the defendant Leonard & Gilmore Company, that, owing to a certain reservation made in a conveyance by Edgar Leonard and others to one Campbell, dated June 24, 1886, and which conveyance forms a link in the chain of plaintiff's title, plaintiff has lost and said defendant acquired the prior right to a portion, at least, of the water power originally conveyed to plaintiff's grantor. The next rights in point of precedence and superiority are part of those held by the defendants Osborne & Cook. They come through a perpetual lease made to one Abel Davis, which in terms antedates the conveyances to plaintiff's grantor, but is expressly made subject thereto, and to the rights thereby conveyed. They are described as the right to so much water as shall be sufficient to move the ordinary machinery of an oil mill, but in no event to exceed what will flow through an aperture ten feet long by six inches wide at the rate of 180 feet per minute. It seemed to be conceded upon the trial that the word "minute" should be "second." In times of slack water the owner of this power is required "to shut down his gate before Solon Stone * * * and Jefferson Woolen Company, but no such demand shall be made while the water runs over the main dam." These same defendants are vested with another right which is subject to that of all the other parties hereto and only to be taken from the surplus waters after satisfaction of their rights, and is to be water "sufficient to drive three central discharge wheels of six feet diameter each."

The remaining rights of the defendants are all posterior in date of grant to those above mentioned given to Solon Stone, to plaintiff, and to Osborne & Cook, through Abel Davis, and in each instance are, I believe, by the terms of conveyance, expressly made subject to the first two rights. They are on a par with each other and no dispute has arisen hereon between any of them. Those upon the north dam and branch are: St. Lawrence Paper Company: The right "to use nine cubic feet of water, or so much as will pass through an aperture three feet square under all the head that can be obtained, to be taken from the south end of the dam across the north

channel of Black river, through a well-secured and tight flume or bulkhead, and used upon the premises hereby granted." Henry Binninger: The right is conveyed by two chains of title to draw $2\frac{1}{2}$ and 2 cubic feet, respectively, "from the north end of the dam across the north channel through a well-secured and tight flume or bulkhead from the flume." Leonard & Gilmore Company: The deed describes certain land, and adds: "With all the water-power rights attached, subject to all the reservations of water contracted to Simeon H. Brown, and not to exceed four and one-half feet, cubic measure." Upon the south dam and branch it is conceded that the ownership is as follows: Jones & Hunter: Nine cubic feet at the south end of channel, less three feet now held by defendant Young. Frontenac Paper Company: Nine cubic feet, north end of channel. Young: The right "to use * * * three square feet of water, or so much water as will pass through an aperture three feet long and one foot wide, under all the head that can be obtained." The conveyances of the various rights held by the parties hereto, respectively, except plaintiff and defendant Osborne & Cook, of their rights to surplus waters, it will be observed, are of definite quantities, measured in most instances by the size of the aperture through which the water is to pass. The obligation is also imposed of conducting the water conveyed through flumes which are tight and well secured. Out of these grants, and upon the general facts above referred to, three questions have arisen to which most of the evidence and arguments of the parties have been addressed, two of which have already been briefly referred to. They are as follows: (1) Is the Solon Stone power now vested in defendant Nutting, or extinguished? (2) Has part of the power originally granted to plaintiff's grantors, through reservations in the chain of title, been diverted from plaintiff, and vested in the defendant Leonard & Gilmore Company? (3) Is plaintiff, by the terms of its paper title, prescription, or otherwise, entitled to the use of all the water claimed by it hereinbefore and superior to the rights of the other parties hereto, or is it claiming greater water rights than it is entitled to? I will consider these questions in the order stated.

1. The Solon Stone Power: In 1831, and before the creation or grant of any of the other water rights herein involved, there was conveyed to Solon Stone the privilege of taking from the northerly dam "to the first-mentioned piece of land" described in the grant, water "sufficient to carry four carding machines and one fulling stocks, but for no other purpose whatever," etc. The land in question is now concededly owned by the defendant Nutting, and the question is litigated whether the power has also passed to her, or has ceased to exist. I do not understand it to be claimed that it has passed to any other party, except as this being the superior of all rights, if the defendant Nutting has not acquired it with the land to which it belonged there would be so much more water for the remaining owners. The decision of this question so raised is dependent upon the following facts, which I regard as established by the evidence, many of them without any dispute. The water power and land to which it pertained, so granted as above, to Solon Stone,

by a chain of conveyances became vested about March 27, 1865, in one Maghee. Prior to November 15, 1867, Maghee had also become vested with another parcel of land and water power, being substantially the ones now owned by plaintiff. Being such owner of these separate properties, he, by deed dated November 15, 1867, conveyed to one Joseph Nutting (to whose rights the defendant Mary has succeeded) the same land as was conveyed to Solon Stone, by metes and bounds. The deed made no specific reference either by way of reservation or grant to the water power, containing simply the ordinary clause: "Together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging or in any wise appertaining, * * * and also all the estate, right, title, interest, dower, right of dower, property, possession, claim, and demand whatsoever, as well in law as in equity, of the said parties of the first part, of, in, and to the above-described premises, and every part and parcel thereof, with the appurtenances." Subsequently, and about March 8, 1884, the executor of the above-named Maghee conveyed to one Camp the lands and water rights now owned by plaintiff, but which do not include the lands to which the Stone power pertained, and also the following, which is conceded to refer to the water power in question: "Also all the reserved water rights acquired by the purchase of mill and water rights of Charles L. Leonard, * * * and afterward conveyed to Joseph Nutting," etc. A chain of title runs from Camp to plaintiff, which contains and includes this purported grant of "reserved" water rights. The real estate to which this Stone power related did not border upon the river or dam, the water being conducted to the mill by artificial channels. Down to, and at the time of, the conveyance by Maghee to Nutting, the mill to which this water power related seems to have been used solely as such. Its use for all of the purposes to which the water power, by the terms of the original grant, was applicable, had not been continued, there being no carding machinery there. Later some of the rooms in it were used for living purposes, but to a greater or less extent the use for milling purposes has always been continued. The same wheel and flume are there now as originally. The channels by which the water is conducted to the mill are, and at the time of Maghee's conveyance were, open and visible. Under all of these circumstances I think that the use of this water power or right, at least for fulling purposes, was so essential and incidental to the reasonable and intended enjoyment of the property at the time conveyed to Nutting, that it passed as an appurtenance without words of specific and express description and conveyance (Spencer v. Kilmer, 151 N. Y. 390, 45 N. E. 865), and that such transfer is not impaired by the fact that the land was described by metes and bounds (page 396, 151 N. Y., and page 866, 45 N. E.), or by the fact that the water power was not derived or taken from lands owned by the grantor himself, he being the conceded owner of the power, and in position to transfer it (Green v. Collins, 86 N. Y. 246). The cases of Parsons v. Johnson, 68 N. Y. 62, and Longendyke v. Anderson, 101 N. Y. 625, 4 N. E. 629, cited by the counsel for Leonard et al. in opposition to the above conclusion, do not seem to be applicable. They relate to

rights of way between which, as so-called "noncontinuous" easements and rights such as are involved here, a definite distinction is drawn. In fact, the opinion that the water power herein discussed did pass under the word "appurtenances" is sustained in the first-mentioned case at pages 66 and 68.

It would appear that this power is in the somewhat inequitable position of having refused to contribute its assessment for the expense of building the present dams. Under the conditions of its grant, however, this does not seem to furnish ground for its forfeiture, but the basis for other action or relief not asked here.

2. The Reservation Claimed by Leonard & Gilmore Company as against Plaintiff of Certain Water Rights. Prior to August 6, 1872, one Huntington became the owner of certain premises now owned by the above-named Leonard & Gilmore Company, and in connection with such ownership he became the owner of one-half of a certain grant of water originally conveyed by one Dexter and others to Nathan W. Brown, and which entire right was described as the right "to use nine cubic feet of water, or so much as will pass through an aperture three feet square under all the head that can be obtained, to be taken from the north end of the dam across the north channel of the Black river, through a well-secured and tight flume or bulkhead, and from the race and flume passing from the canal across Lock street northerly; the said water to be used upon the premises hereby granted." (And which premises were those owned by Huntington as above stated.) On or about August 6, 1872, said Huntington conveyed to one Edgar Leonard the premises and water power above described. On or about November 5, 1853, one Maghee had become the owner of the premises upon which plaintiff's factory is situated, and of the water rights running in the chain of title with said premises, and which water rights, whatever their other limitations were, were prior to those conveyed to Huntington as above. These premises and these superior water rights last described had, prior to June 24, 1886, duly passed to Edgar Leonard, George E. Leonard, James A. Gilmore, and William E. Leonard, and these last-named persons on or about June 24, 1886, made a conveyance of said premises and water rights to one Campbell, through whom plaintiff's title is derived, which conveyance contained a clause giving rise to the present controversy between plaintiff and the Leonard & Gilmore Company, as the present owners of the Huntington power above mentioned, as to which rights are prior. This conveyance, after describing the property and water rights to be conveyed, and which, as stated, are now owned by plaintiff, contained the following clause:

"The foregoing grant of water and water rights is subject to the right of Edgar Leonard and his legal representatives at all times to draw four and one-half feet of water (cubic measure) from the north end of the short dam across Black river to the shop and factory situated on premises conveyed by Joseph Huntington to said Edgar Leonard by deed dated August 6, 1872," etc.

At the time this conveyance containing this clause was made, Edgar Leonard was still the owner, by record title, at least, of the premises and water power conveyed to him by said Huntington as hereinbefore stated and in said clause referred to. And the question arises

whether, as claimed by plaintiff, this clause is to be construed as an extra precaution to prevent the possibility of the Huntington power so owned by Edgar Leonard from passing under the deed which he and others upon the last-mentioned date executed to Campbell, without any intention of changing or improving its position, or whether it is to be construed, as now claimed in behalf of the defendants Leonard & Gilmore Company (who have succeeded to Edgar Leonard's rights), as changing the water rights conveyed to plaintiff from the position of superiority which they had always held over the Huntington power to a condition of subjection and subordination to that power, for this latter is the claim now made in behalf of defendant. Whatever suggestions may have been made either by the pleadings or upon the trial that this clause reserved to Edgar Leonard some new water power additional to that going with the Huntington property have now been abandoned, and the counsel for said defendants, by his brief, says:

"It is not claimed that four and one-half cubic feet in addition was added to the Huntington power, but that the four and one-half feet of the Huntington power was taken from its subordinate, and placed to the condition of priority of right to that extent. Beyond the quantity four and one-half cubic feet of water after that priority was secured there was no reservation of the right to take any greater quantity of water, and hence the Huntington power, while it enjoys the four and one-half cubic feet of water prior to the rights of the plaintiffs, yet the plaintiffs have a right to stop the Huntington power if the Huntington power attempts to draw more than four and one-half cubic feet of water; but the plaintiff's right is subordinate to the Huntington power to the extent of four and one-half feet of water."

In deciding this question so raised I have reached the conclusion urged by plaintiff, namely, that this clause was intended to prevent any possibility of embarrassment to Edgar Leonard in his ownership of the Huntington power by the deed which he and his associates executed to Campbell, and which was manifestly intended to cover other property and rights. This conclusion seems to me to be more in accord with the circumstances and with the language used than the other one. Edgar Leonard was the owner of this power to draw $4\frac{1}{2}$ cubic feet of water from the north end of the short dam across Black river to the shop and factory, situated on the premises conveyed by Joseph Huntington. This being so, he and his associates executed the deed to Campbell, which, after describing the land, canal and waste weir to be conveyed, contained this clause:

"Together with the hereditaments and appurtenances and all the machinery now in said factory, and all the estate, right, title, and interest of the party of the first part in and to the same and the reversions and remainders thereof, including all the rights of the party of the first part to the use of the water from the pond, and to convey the same and use the same in operating said factory as fully and as amply as the same are now owned or employed by the parties of the first part."

As I have said, it was concededly the intention of the first parties in that conveyance not to convey the Huntington power, and I can readily understand how the person drawing that conveyance might reason that the language already referred to and quoted would not convey it, but that still, as a matter of precaution, it would be well enough to put in a clause expressly stating, in substance, that it was not intended to so convey it. And hence we have this clause in question

which makes the conveyance subject to the right of Edgar Leonard as a right then actually existing and held by him, and which right, because it did actually exist, and therefore was defined and described by its actual existence and usage and enjoyment, was described in the clause in the very informal way as the right to draw certain water. The description of the right as it then existed for so brief and informal language is substantially correct. It is mentioned as the right at all times to draw a certain quantity of water, and as matter of fact the right was at all times to draw a certain quantity of water, subject to certain prior rights held by one or two other parties in the pond, which priority, I believe, at that time had never been in force to prevent the Huntington power from at all times drawing $4\frac{1}{2}$ feet, just as described in this clause. It seems to me, therefore, that the construction now given, applying this clause to the description as a matter of precaution of an actually existing right, fits the occasion, the circumstances surrounding the draft of the clause, and the brief and informal language used. Upon the other hand, if it had been intended by this clause to create an entirely new right in Edgar Leonard, and to (as claimed by defendants) change the position of a water power so important as the Huntington one from a condition of parity with several other water powers and one of subjection to plaintiff's power into a condition superior to all of them, more full and careful language would have been used by the attorney, who is especially said by defendants to have been careful, to express that idea. A consideration of the deed itself containing this clause supports the construction now given. By the first part of it (taking into account the references to prior conveyances and rights then enjoyed by the grantors) it conveyed to plaintiff's grantor the lands in question, and the water rights going therewith, as superior to the Huntington power, because, concededly, the grantors in that deed held the water rights subsequently conveyed by Campbell superior to the Huntington power, and they conveyed by the first part of their deed all the rights and estate which they held. It would be somewhat inharmonious, then, to place in the deed a subsequent brief clause to the effect, as claimed by defendants, that it was not really intended to convey a superior estate therein fully described, but as a matter of fact an estate which, instead of being superior, should to a large extent be inferior to other rights. On the other hand, it is quite in accordance with the first part of the deed that this clause in question should be inserted, saying, in effect: "But this estate already granted is not in any manner to interfere with the other and Huntington power held by one of the grantors."

Some acts of the parties have been referred to as sustaining the construction claimed by defendant, and special attention is called to the fact that in 1891 the plaintiff executed with Leonard and others a lease of the $4\frac{1}{2}$ feet of water power now claimed to have been reserved to Edgar Leonard. I do not, however, regard this act as especially significant or helpful upon this question. It would seem to me more proper to explain it as the result of a confused and inaccurate conception by the parties of their positions and rights than as evidence upon which to predicate an exact and strict construction of those rights. In the first place, the lease, by its recitals, seems to treat Edgar Leon-

ard as having actually reserved an independent right to draw $4\frac{1}{2}$ cubic feet of water to the Huntington shop, which is quite at variance with the present theory of defendants that it was simply intended to change a subordinate to prior right, and not otherwise to acquire new rights. Again, if the Huntington power was then treated by plaintiff as a subordinate right, there was no reason why it should not rent that power in addition to the rights otherwise enjoyed by it, and which were limited in their priority as against the Huntington power. And, lastly, as I understand it, this $4\frac{1}{2}$ feet of water could not legally be used anywhere except on the Huntington premises, and therefore the lease was virtually ineffective. I simply make these suggestions as bearing on the propriety of attaching any very strict significance to this lease as an act of construction of the clause itself. The lease, and any significance which the parties themselves ever attached to it, was canceled a short time after it was executed. It would seem as if this act was fairly offset by the other facts in evidence that after the deed with this clause in it was executed the parties in plaintiff's chain of title and in defendant's chain of title to the Huntington power continued paying their assessments in maintaining the dam in the same proportion and same amount as when the Huntington power was concededly inferior to those enjoyed by plaintiff. There is one act which seems to be significant if that effect is to be given to any of the transactions of these parties. In 1890, Edgar Leonard executed to himself, James A. Gilmore, George E. Leonard, and William E. Leonard, composing the defendant firm of Leonard, Gilmore & Co., a conveyance of the Huntington property and power, in which no reference is made to the so-called "reservation clause" hereinbefore referred to, or to any rights claimed to have been acquired thereunder. It very likely is true, as claimed by defendant's counsel, that if the Huntington power had been made superior to plaintiff's rights, such superiority would have passed with the other appurtenances under the deed, if nothing specifically was said about it. But the trouble with that theory is that Leonard not only did not say anything about conveying a newly-acquired superiority or right, but by the terms of his conveyance he made this power expressly subject to that held by plaintiff, for in his deed, after describing the land and water power, this clause is inserted: "Subject to all conditions and stipulations contained in a deed of said property from S. Newton Dexter and others to Nathan Brown, dated January 1, 1842," etc., and by this deed the power of which the Huntington one is a part is expressly made subject to and subordinate to those conveyed to and claimed by plaintiff.

3. The Amount of Water to which Plaintiff is Entitled. By the terms of the grant to plaintiff's predecessor, the Jefferson Woolen Company, the latter acquired the right to use "so much water as shall be sufficient for the uses and purposes of the woolen manufactory situated upon said premises [those in question], provided that the river, under the hereinafter mentioned restrictions, shall yield so much water; the said race to be kept in good repair by the party of the second part [the woolen company], and the water to be drawn through tight and well-secured flumes and bulkheads, and to be used in an economical manner, without unnecessary waste." As

already indicated, this right was superior to all of those represented here except the Stone power, and, in my opinion, has passed un.m-paired to plaintiff. We are, therefore, to measure the quantity of water which plaintiff can draw and use by the quantity which at the time of the grant in question was "sufficient for the uses and purposes of the woolen factory." It is probably needless to remark that the solution of this question and the application of this measurement have been perplexing and unsatisfactory to an extent which neither the quite voluminous evidence nor the elaborate and painstaking arguments of the counsel have been able to entirely remove. A large amount of scientific and theoretical evidence was given, which would quite plainly lead to certain conclusions, certain facts being given, or, as was frequently done, assumed. But, after all this, when consideration is directed to the question how much water was "sufficient for the uses and purposes of the woolen manufactory," as it was operated upward of 60 years ago,—the conceded test of plaintiff's rights,—it becomes necessary to have actual facts, and not theory. These, not through any fault of those charged with the duty of presenting them, but from the inherent difficulties attending an investigation of conditions existing so long ago, have been meager. No one upon any side has attempted to describe, by the direct measurement of cubic feet or gallons, the quantity of water which was used by plaintiff's predecessor. The attempt has been made to measure the relative quantities of water used at different times by reference to and description of (1) the number and size of water wheels employed; (2) the amount of horse power developed, and of machinery operated, by the water power in question. Considerable evidence has been given upon these subjects for the purpose of showing that plaintiff does or does not use more water than was conveyed by the terms of grant already quoted. There are difficulties and imperfections in these methods of test, even when the actual facts are determined from the very conflicting evidence relating to them. The size, and even the number, of wheels used in the mills now owned by plaintiff at different times are not necessarily a correct index of the relative quantities of water used at those respective times, for it seems to be conceded that with the advance in the science of manufacture larger or more wheels need not now necessarily require more water for their operation than smaller, or a smaller number of, wheels did. So, again, the mere fact that more horse power is developed and machinery used in plaintiff's mill now than formerly does not of itself indicate a greater use of water; for, independent of the greater efficiency of some wheels over others in utilizing the same quantity of water, it is conceded that the same wheel with the same quantity of water will develop horse power increasing in proportion to increase in the fall or "head" of the water. The evidence of these details necessary to make the wheels used, the number of horse power developed or machinery moved at some time a correct measure of the quantity of the water then used as compared with the volume employed at another time, when different results in the way of motive power have been obtained, has been both unsatisfactory and contradictory. I do not remember

that but one witness attempted to give the number of horse power developed in the early days of the mill.   The evidence upon that subject was not very convincing.   Moreover, while there are said to have been three wheels employed at that time, very little proof was given in regard to those details necessary to an intelligent comparison with other periods of the character and efficiency of the wheels,—especially one of them,—or of the head under which they were operated.   At one time, under the management of Mr. Hall, the number of some of the machines in the mill was increased.   As already stated, this would not necessarily mean an increase in the amount of water used; and naturally we find one line of evidence that this increase in machinery did not increase the quantity of water used, and another line quite as positive that it did.   I doubt if any of the witnesses spoke upon the subject as the result of any really accurate or reliable measurements made at the time.   There is another difficulty about this measurement of water used by the horse power developed now and originally.   Outside of the water which went into, and therefore, in any event, could be measured by horse power, the original grantee of this power used water for "wash" water.   Some of the witnesses say that the quantity so used was very large,—I think, one-half of what was employed for developing power; others that it was insignificant in amount.   No accurate measurement is given or was made by any of them.   With the uncertainties and embarrassments thus attendant upon the methods of measurement by number of water wheels used, power developed, or machinery moved, as above considered, I have concluded to be guided by another test, which, while perhaps less scientific, is quite as reliable in this case, and certainly more simple.   Upon all of the evidence I regard it as quite satisfactorily established that the factory now owned by plaintiff, and the machinery therein, as maintained by its predecessors, required for a full and complete use and operation that at times the water in the pond should be accumulated to the crest of the dams; and that other owners of power, succeeded now, in some cases, at least, by defendants herein, respectively, recognized and acquiesced in this use and enjoyment.   Many witnesses, speaking of various times, and covering altogether a period reaching back to the very early period of the mill, have, by their testimony, sustained the claim.   This, then, would be a simple method by which to measure the quantity of water granted to the Jefferson Woolen Company, and the extent of plaintiff's rights as its successor under that grant,—that it should, when necessary, be entitled as against the subordinate power owners to have the water accumulate to the top of the dams.   This also would be a just and proper test, provided the height of the dams and the size and capacity of the canal and flume through which the water is drawn from them to plaintiff's mill are the same now as when the woolen company enjoyed its water privileges to the limit mentioned; for, of course, if they are the same now as then, plaintiff would draw and use the same amount of water when the water rose to the top of the dams as did the woolen company, and thus be within the uses, privileges, and limits as established by the latter.

The evidence is, without substantial dispute, that the flume or canal through which water is taken from the pond to the mill from the date of construction to the present time has been and is practically unchanged. Much of it is constructed through rock, and there is especially no evidence to indicate that certain cross section: of it, which, of course, limit its capacity of water flow, have ever been changed or enlarged. In fact, it would seem that through the efforts made to stop leaks in it the amount of water which might find through it an escape from the dam has been diminished. So far as the dams are concerned, I do not think their height has been continued just as it originally was. With the continually increasing value of water power at the place where these rights exist, and the probably diminishing supply of water in proportion to the demand, I think that all of the power owners—at least the larger ones—have been strenuously endeavoring to perfect and utilize to the utmost their rights, and that possibly, in some instances, there has been an unintentional increase of one right at the expense of or with encroachment upon another one. The dams, as originally constructed at this point, were concededly crude and imperfect in their construction. They were leaky, and not so firm and substantial as to withstand at all times the pressure of water. They were built over from time to time, the last occasion being the year 1888, and since that time the top of one or more of them has been leveled and "trued" up. I do not think that there was any intention upon the part of anybody to build them in excess of the height established by preceding dams, nor do I think that they were built to any such excess of height as claimed by some of the witnesses. The fact that they were built by concert of action among the different power owners, and that many of the latter were present more or less during the construction, would indicate that there was no very great deviation from proper lines, and, in my judgment, an allowance of six inches upon the dams as they now stand would be sufficient to cover the amount of height increased and gained over preceding dams, and a decree securing to plaintiff the right as against subordinate owners of power, parties to this action, when necessary, to have the water in the pond accumulate to within six inches of the top of the dams, would apply the proper measure and limit of its water rights as established by the uses and enjoyment of its predecessors. Costs are allowed to plaintiff as against all the defendants who have appeared herein except the defendant Nutting.

Ordered accordingly.